**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3158
_____

UNITED STATES OF AMERICA

v.

DONTE TAYLOR,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No.: 2-18-cr-00242-001)
District Judge: Honorable David S. Cercone

_____

Argued November 16, 2021

(Filed: December 21, 2021)

Before:  AMBRO, JORDAN, and RENDELL, *Circuit
Judges*.

Lisa B. Freedland
Renee Pietropaolo (Argued)
Office of Federal Public Defender

1001 Liberty Avenue
Suite 1500
Pittsburgh, PA 15222

        Counsel for Appellant

Stephen R. Kaufman
Laura S. Irwin (Argued)
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

        Counsel for Appellee

_____

## OPINION OF THE COURT

_____

RENDELL, *Circuit Judge*.

     In January 2020, a federal jury found Donte Taylor guilty of possession with intent to distribute controlled substances. Before us, Taylor raises a single claim of error: that the District Court violated his Sixth Amendment right to represent himself when it denied his request to proceed *pro se*. The Sixth Amendment guarantees a criminal defendant, such as Taylor, the right to self-representation if he "knowingly and intelligently" waives his concomitant Sixth Amendment right to counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975). Thus, when Taylor invoked his right to represent himself, the District Court bore "the weighty responsibility of conducting a sufficiently penetrating inquiry to satisfy itself that" Taylor

2

could make such a waiver. *United States v. Peppers*, 302 F.3d 120, 130-31 (3d Cir. 2002). We acknowledge that Taylor was a difficult defendant, questioning the District Court's jurisdiction and pressing meritless legal arguments in *pro se* filings. Nonetheless, because the District Court denied Taylor's request without completing the requisite inquiry, we will vacate Taylor's conviction and remand for a new trial.

I.

In September 2017, Taylor was paroled and released from prison after serving a term of imprisonment for state drug offenses. Under the terms of his release, Taylor's probation officer, Kent Jones, would conduct unannounced home visits of Taylor's residence in Duquesne, Pennsylvania, which he shared with his girlfriend. On one such visit, which led to a search of the residence, Jones and other law enforcement officers discovered marijuana, crack cocaine, a firearm, and a significant amount of cash. Following the search, Taylor was arrested.

In September 2018, a grand jury returned a single-count indictment against Taylor for unlawfully possessing controlled substances with the intent to distribute those substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii), 841(b)(1)(C), and 841(b)(1)(D). The next month, the District Court appointed Robert S. Carey, Jr. to represent Taylor. Several months later, Taylor moved to suppress the evidence obtained during the search of his residence. After the Government moved to continue the initial hearing, the District Court scheduled a hearing on Taylor's suppression motion for May 31, 2019.

3

Several weeks before the scheduled suppression hearing, Taylor filed two *pro se* motions for his immediate release. A few days after the second motion, Carey moved to withdraw as Taylor's counsel. He claimed that "the attorney/client relationship [was] irreparably damaged" because Taylor would not permit him to withdraw these two *pro se* motions in which Taylor refused to "accept that the laws of the United States govern him." App. 37-38. The District Court denied Carey's motion to withdraw approximately two weeks later. In the interim, Taylor had filed two more *pro se* documents. The day after the District Court denied his first motion, Carey moved to withdraw a second time, explaining that Taylor had "advised [him] that the attorney/client relationship was terminated" and "desires to proceed *pro se*." App. 41-42. Over the next several days in the lead-up to the scheduled suppression hearing, Taylor entered five more *pro se* filings.

The District Court held the scheduled suppression hearing on May 31, 2019. It began the hearing by addressing Carey's second motion to withdraw. Carey explained that Taylor wanted to represent himself, but Carey had "concerns of a substantial nature [concerning] [Taylor's] legal competency." App. 53-54. As the District Court considered his competency, Taylor, addressing the Court directly, sought permission to represent himself. When he acknowledged that he "d[id not] understand law" and therefore requested that the District Court "deal with [him] commonly," the District Court expressed its misgivings about Taylor's ability to represent himself: "[W]hat concerns the Court is that some of [Taylor's] pro se motions are just so—they're of a rambling nature, and they are not founded on any rational legal principles." App. 56-57. It elaborated that these filings "send[] up a red flag that,

4

even though [Taylor] may be legally competent in that [he] understand[s] the nature of these proceedings, that's a different standard as to whether [he] [is] able to effectively represent [himself]." App. 57.

In response, Taylor explained that he would "ask questions if [he] [did not] understand" the proceedings. App. 58. The District Court explained that it was "not here to answer [Taylor's] questions"; he should look to counsel for this purpose. App. 58. Taylor replied that he "just want[ed] to know if the Court [could] deal with [him] commonly so that [he] [could] speak regularly to" the Court and the prosecutor. App. 58. The District Court advised Taylor that trials involved complex rules, and that Taylor would be "at a great disadvantage by trying to represent [himself]." App. 58-59. Taylor again asked that the District Court "deal[] with [him] commonly so [he could] get an understanding of what[] [would be] said." App. 59. The Court responded that it would "deal with [Taylor] . . . as [it] [had] been, explaining things on a level that [Taylor] [could] mentally assimilate," and it reiterated that Taylor "[would] be at a very great disadvantage in representing [himself]." App. 59.

Wrapping up the colloquy, the District Court returned to its concerns about Taylor's request in light of his *pro se* filings, stating that his "understanding or [his] perceptions of legal principles [were] so askew that [Taylor and the Court] [were] on very shaky grounds." App. 59. It determined that Taylor did not need a mental health evaluation, yet it proposed taking a break to give it time to conduct "basic fundamental research" about his request before it ruled definitively. App. 59-60.

5

Taylor then asked the Court to consider "a jurisdictional issue in this proceeding," which he had raised in his *pro se* filings. App. 60. In response, the District Court explained that, because Taylor was still represented by counsel, it would not consider his *pro se* filings. Carey interjected and mentioned that in one such filing Taylor contended that "the United States is not a country. It is a corporation. [Taylor] [is] not a United States citizen, nor [is] [he] an employee, agent of the United States." App. 62. The District Court once again expressed its concerns about Taylor's ability to represent himself. It explained to Taylor that it would not "allow [him] to turn this case into some strange journey with these theories that have absolutely no basis in law or logic." App. 62-63. Taylor again claimed that the District Court had not established its jurisdiction over him. He then stated his name, address, and social security number. The District Court told Taylor that it would not engage in further discussion of his jurisdictional issue after he tried to broach the issue for a third time.

Despite the District Court's warning, Taylor continued, seeking to read two dictionary definitions of the United States into the record. At this moment, the District Court denied Taylor's request to represent himself:

> THE COURT: No. I told you I'm not going to allow you to go down that path. And I can see—I can rule right from the bench right now. I don't need any research. You are not going to be permitted to represent yourself. No way. No way. I'm not going to let you represent yourself.

6

> MR. TAYLOR: All right. Well, Your Honor, the Defendant would like to invoke his Fourth and Fourteenth Amendment right in regarding—
>
> THE COURT: Okay. Whatever you say, I don't know what that means, but you're not going to represent yourself. You're not. Your arguments make no sense. They're convoluted. They're just a waste of time. And I'm not going to turn this proceeding upside-down. I'm not going to do it.

App. 64-65. The District Court then ended its colloquy and returned to Carey's motion to withdraw. It determined that Carey could withdraw only after he represented Taylor through the end of the suppression hearing. Next, the Court turned to Taylor's motion to suppress, which it ultimately denied.

The following month, the District Court granted Carey's second motion to withdraw and appointed James J. Brink to serve as Taylor's counsel. Six months later, in January 2020, the grand jury entered a superseding indictment, which charged Taylor with the same count as his previous indictment.[1] The next week, Taylor, represented by Brink, was

---

[1] Unlike the superseding indictment, Taylor's initial indictment also charged Ericka Smith, his girlfriend, with aiding and abetting his possession of controlled substances with the intent to distribute.

found guilty on this sole count after a brief jury trial. He was later sentenced to a term of imprisonment of 264 months.

Taylor timely appealed.[2]

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We engage in "plenary review" of the District Court's determination of whether a defendant may exercise his Sixth Amendment right to self-representation. *Peppers*, 302 F.3d at 127. In this review, "we must indulge every reasonable presumption against a waiver of counsel." *United States v. Jones*, 452 F.3d 223, 230 (3d Cir. 2006) (internal quotation marks and citation omitted). We also review the facts found by the District Court for clear error. *Peppers*, 302 F.3d at 127. Because the District Court commits structural error if it improperly denies a defendant's request to represent himself, we may not consider its error harmless. *Id.*

## III.

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819. As a result, it guarantees a criminal defendant the right to decline the assistance of counsel and to represent himself. *See id.* at 819-21; *Jones*, 452 F.3d at 228. Of course, to exercise this right, a defendant must relinquish his right to counsel and

---

[2] On appeal, Taylor challenges only the District Court's denial of his request to represent himself.

its accompanying benefits. *Peppers*, 302 F.3d at 129. Thus, he must knowingly, intelligently, and voluntarily waive his right to counsel before a court may allow him to proceed *pro se*. *Buhl v. Cooksey*, 233 F.3d 783, 789 (3d Cir. 2000).

Because of this "tension between the right to have counsel and the right to represent oneself," a "trial court [shoulders] the weighty responsibility of conducting a sufficiently penetrating inquiry to satisfy itself that the defendant's waiver of counsel is knowing and understanding as well as voluntary." *Peppers*, 302 F.3d at 130-31. During this inquiry, the court must ascertain whether the defendant

> (1) has clearly and unequivocally asserted his desire to represent himself; (2) understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that [he] may encounter, and any other factors important to a general understanding of the risks involved; and (3) is competent to stand trial.

*Jones*, 452 F.3d at 228-29 (alteration in original) (internal quotation marks and citation omitted). Just as a court may not discharge this duty through "[p]erfunctory questioning," *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982), it may not do so through recitation of a "rote speech," *Virgin Islands v. Charles*, 72 F.3d 401, 404 (3d Cir. 1995). "Rather, a [d]istrict [c]ourt must engage in a 'penetrating and comprehensive examination of all the circumstances'" before accepting or rejecting a defendant's waiver of his right to

counsel. *Jones*, 452 F.3d at 228 (quoting *Peppers*, 302 F.3d at 131). Indeed, without undertaking such an inquiry, "a district court cannot make an informed decision as to the knowing and voluntary nature of a defendant's request to proceed *pro se*." *Peppers*, 302 F.3d at 133.

On appeal, Taylor contends that the District Court erred because it denied his request based on its assessment of his understanding of law rather than the potential risks and consequences of proceeding *pro se*.[3] That argument, then, leads us to examine the District Court's basis for denying Taylor's request. In other words, we must determine whether the District Court satisfied the *Peppers* inquiry's second requirement, namely, whether Taylor could not appreciate the advantages he would forgo by waiving his right to counsel, the challenges self-representation could present, and the

---

[3] Taylor preserved this issue for appeal despite the Government's suggestion that he may have failed to do so. Although Taylor did not redouble his efforts to represent himself after the suppression hearing, he did not need to do so because the District Court definitively denied his clear request. *See Buhl*, 233 F.3d at 803 (concluding that the defendant did not abandon his right to self-representation when the court "denied [his] motion to proceed pro se in no uncertain terms," and he accepted the court's decision); *see also id.* ("To avoid a waiver of a previously-invoked right to self-representation, a defendant is not required continually to renew a request once it is conclusively denied or to make fruitless motions or forego cooperation with defense counsel in order to preserve the issue on appeal." (quoting *Orazio v. Duggar*, 876 F.2d 1508, 1512 (11th Cir. 1989))).

10

consequences he could face if found guilty.[4] *Peppers*, 302 F.3d at 134. Taylor maintains that, rather than fulfill this responsibility during its colloquy, the Court "focus[ed] on

---

[4] Both Taylor and the Government agree that the other two *Peppers* inquiry requirements—that Taylor made a clear and unequivocal request to represent himself and was competent to stand trial—are not in dispute. We find that Taylor satisfied both requirements. First, he told the District Court that he "wishe[d] to proceed pro se." App. 53; *see United States v. Stubbs*, 281 F.3d 109, 117-18 (3d Cir. 2002) (determining that the defendant "clearly and unequivocally" invoked his right to self-representation when he told the court that "I'm going to do my own thing . . . I'm going to represent myself as of now" (alteration in original)). Second, even though the District Court had concerns about Taylor's competency, it did not find him incompetent. Because the record does not raise doubts as to his competency, *see United States v. Coleman*, 871 F.3d 470, 476-77 (6th Cir. 2017) (determining that the defendant's arguments based in sovereign citizenship's tenets did not on their own suggest that he was incompetent); *United States v. Neal*, 776 F.3d 645, 657 (9th Cir. 2015) ("[V]oluminous filings of nonsensical pleadings do not create per se serious doubt about competency."), we will not question the District Court's determination, *see Charles*, 72 F.3d at 405-06 (explaining that, because the district court "was in the best position to observe [the defendant], evaluate his mental state, and determine whether a follow-up evaluation was necessary," the court would not "second guess the district court's [competency] determination").

whether [he] could effectively represent himself."[5] Appellant's Br. 29 (emphasis omitted).

We agree that the District Court appears to have misdirected its focus when evaluating Taylor's request to represent himself. In his *pro se* filings and at the suppression hearing, Taylor advanced "sovereign citizen" arguments.[6]

---

[5] The Government suggests that whether the District Court's colloquy satisfied *Peppers* is not before us because Taylor's opening brief "did not challenge the *Peppers* colloquy in [this] respect." Appellee's Suppl. Br. 3 n.2. "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Moreover, as Taylor axiomatically challenges whether the District Court conducted a sufficient inquiry in arguing that it violated *Peppers* by denying his request based on its perception of his understanding of law, whether the colloquy comported with *Peppers* is squarely before us.

[6] Although "sovereign citizens" do not share identical beliefs, they generally believe that they are neither subject to federal law nor federal courts' jurisdiction. *See United States v. Banks*, 828 F.3d 609, 615 n.1 (7th Cir. 2016) ("Defendants claiming to be 'sovereign citizens' assert that the federal government is illegitimate and insist that they are not subject to its jurisdiction." (internal quotation marks and citation omitted)); *see also United States v. DiMartino*, 949 F.3d 67, 69 (2d Cir. 2020) (explaining that "the Sovereign Citizen movement" is "a loosely affiliated group who follow their own set of laws and, accordingly, do not recognize federal, state, or

*E.g.*, App. 60-61 (questioning the District Court's jurisdiction); App. 62 (discussing Taylor's *pro se* filing in which he contends that he is "not a United States citizen, nor [is he] an employee, agent of the United States); App. 63 ("What I'm saying here today is I don't recognize the jurisdiction in this courtroom."). The District Court focused on these arguments, noting that Taylor's claims were "not founded on any rational legal principles" and "sen[t] up a red flag." App. 57. The record further indicates that the District Court had the merits of Taylor's claims in mind rather than his appreciation for the consequences of representing himself when it denied his request:

> Whatever you say, I don't know what that means, but you're not going to represent yourself. You're not. Your arguments make no sense. They're convoluted. They're just a waste of time. And I'm not going to turn this

---

local laws, policies or regulations as legitimate" (internal quotation marks and citation omitted). Their claims, including Taylor's, of course, lack merit. *See United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011) ("Regardless of an individual's claimed status of descent, be it as a 'sovereign citizen,' a 'secured-party creditor,' or a 'flesh-and-blood human being,' that person is not beyond the jurisdiction of the courts.").

13

> proceeding upside-down. I'm not
> going to do it.

App. 65.

We share the District Court's concerns about the merits of Taylor's "sovereign citizen" arguments and their potential to upend courtroom proceedings, but these concerns should not have formed the heart of the District Court's inquiry nor the basis for its determination. Courts have repeatedly concluded that "sovereign citizens" may represent themselves despite their frivolous beliefs about the law. *See, e.g.*, *United States v. Johnson*, 980 F.3d 570 (7th Cir. 2020) (holding that the district court did not err in allowing a "sovereign citizen" defendant to represent himself); *United States v. Mesquiti*, 854 F.3d 267 (5th Cir. 2017) (same); *United States v. Banks*, 828 F.3d 609 (7th Cir. 2016) (same). That is so because a court's assessment of a defendant's "sovereign citizen" claims sheds little light on the defendant's appreciation of the risks and consequences of self-representation. *Cf. Neal*, 776 F.3d at 658-59 (concluding that the defendant knowingly and intelligently waived his right to counsel when he appeared to understand self-representation's consequences even though he "clearly endorsed the 'sovereign citizen' ideology").

The District Court should have examined Taylor's understanding "of the technical problems he may [have] encounter[ed] in acting as his own attorney and of the risks he [would] take[] if his defense efforts [were] unsuccessful." *Peppers*, 302 F.3d at 135 (quoting *Henderson v. Frank*, 155 F.3d 159, 166 (3d Cir. 1998)). In *Peppers*, we held that the district court erred because it denied the defendant's request to represent himself after focusing its inquiry on the defendant's knowledge of the law and practical ability to mount a defense.

14

*Id.* at 134, 137. We determined that, instead, the court should have investigated whether the defendant appreciated "the structural limitations or perils of representing himself." *Id.* at 134. Here, the District Court advised Taylor at a general level about some of these limitations and perils. It explained that he would need to follow certain rules and procedures if he were to represent himself, and it warned him that he could not look to the Court for assistance. Yet, the District Court did not probe whether Taylor understood the risks and consequences of representing himself during this colloquy. Rather, it continued to return to Taylor's arguments and the concerns they raised. Thus, like the district court in *Peppers*, it erred by failing to adequately investigate Taylor's request to represent himself before denying his request. *Id.* at 134 ("Absent a proper inquiry, the District Court had no basis upon which to deny—or to grant—[the defendant's] request for self-representation."); *see also Jones v. Norman*, 633 F.3d 661, 667 (8th Cir. 2011) (holding that the trial court erred when it denied the defendant's request to represent himself because "under the guise of inquiring about the validity of [the defendant's] waiver, the trial court improperly considered factors related to [the defendant's] ability to represent himself").

To ensure that a trial court has a basis for its decision to permit or prohibit self-representation, we have recommended that it structure its *Faretta* inquiry around a set of model questions. *See Jones*, 452 F.3d at 229; *Peppers*, 302 F.3d at 136-37. By relying on these questions, a trial court not only warns the defendant of self-representation's consequences but also learns whether he appreciates those same consequences. That said, we do not require all trial courts to ask these questions—"there is no talismanic formula for the court's inquiry." *Peppers*, 302 F.3d at 135. Indeed, we recognize that

15

a court may employ tools other than direct questioning if the circumstances call for them. *See United States v. Garey*, 540 F.3d 1253, 1267-68 (11th Cir. 2008) (en banc) (explaining that, when a defendant refuses to engage in a dialogue with the court, "a *Faretta*-like monologue will suffice"). Nevertheless, at a minimum, the inquiry must address whether the defendant understands "the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder" to enable the trial court to assure itself that the defendant knowingly and intelligently waives his right to counsel. *United States v. Booker*, 684 F.3d 421, 425-26 (3d Cir. 2012) (emphasis omitted) (quoting *United States v. Moskovits*, 86 F.3d 1303, 1306 (3d Cir. 1996)) (discussing the standard for an effective waiver of the right to counsel).[7] The District Court's inquiry here, which understandably focused on procedural problems that appeared likely to follow from Taylor's self-representation, fell short of this minimum.[8]

---

[7] In *Jones*, we stated that a trial court must examine "all of the subjects covered in the model questions set forth in *Peppers . . .* to the extent those subjects are relevant." *Jones*, 452 F.3d at 234 (footnote omitted); *see also Booker*, 684 F.3d at 426. However, we do not doubt that there could be a case where we approve of a district court's inquiry and its resulting conclusion even though the district court bypassed one or more such subjects. Nonetheless, we have no occasion here to opine on this issue because the District Court stopped short of a meaningful inquiry.

[8] The Government argues that the District Court's abbreviated colloquy passes muster under the Supreme Court's "pragmatic approach to the waiver question," *Patterson v. Illinois*, 487 U.S. 285, 298 (1988). We, however, conclude that it does not.

Despite the Government's arguments to the contrary, the District Court erred by failing to find out whether Taylor understood the risks and consequences of self-representation. The Government claims that the Court gathered enough information about Taylor's understanding because "Taylor failed to adhere to the District Court's decisions and thus failed to demonstrate his knowledge and appreciation of the importance of counsel or the consequences of self-representation." Appellee's Br. 26. If a defendant disobeys the court's directions and, in doing so, stymies its inquiry into the defendant's request to represent himself, the court may truncate its *Faretta* colloquy. *See United States v. Pryor*, 842 F.3d 441, 449 (6th Cir. 2016) ("[The defendant's] refusal to provide a straight answer to the thrice-repeated question of whether he wished to be represented by counsel or by himself was a rejection of further inquiry into his waiver of counsel and justified the magistrate judge's conclusion of the colloquy."). However, it ought not end its inquiry when the defendant proves obstinate only briefly. Although Taylor wanted to argue about the District Court's jurisdiction and tried to steer

In *Iowa v. Tovar*, the Court recognized that a defendant may receive "less rigorous warnings pretrial" under this pragmatic approach. 541 U.S. 77, 90 (2004). But it held that the court must at least "inform[] the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea" when a defendant seeks to represent himself at his arraignment. *Id.* at 81. Accordingly, even under a "pragmatic approach," the District Court's inquiry would remain inadequate because it never advised Taylor on these subjects nor probed his understanding of them during the colloquy.

the Court's attention to that subject, he did not thwart its inquiry. The Court elected to pause its colloquy with Taylor when it indicated that it wanted to perform additional research. And, moments later, it denied Taylor's request outright when he pressed the Court to consider his "sovereign citizen" claims again.

The District Court took this step even though the colloquy revealed little evidence that Taylor could not understand the risks and consequences of waiving his right to counsel. He repeatedly requested that the Court speak with him "commonly" if he were to represent himself. App. 56-57, 58, 59. Each time, it advised that it had a limited ability to explain the complexities of the law and the criminal proceedings. While the Court may have exhausted its ability to clarify these limitations after the third attempt, it remained obliged to ascertain whether Taylor, in fact, failed to grasp self-representation's risks and consequences. *See Peppers*, 302 F.3d at 137 ("[I]f, during the course of inquiry, it appears that the defendant needs further explanation, or it is evident that the defendant does not comprehend what the court is saying or asking, the court will need to probe further." (footnote omitted)); *cf. Stubbs*, 281 F.3d at 119-20 (determining that the district court erred when allowed a defendant to proceed *pro se* because, among other things, during the *Faretta* colloquy, the defendant indicated that he had not understood the court's warning, and the court did not attempt to clarify this confusion). The District Court did not ask Taylor about his understanding and thus did not follow through on this obligation. As a result, we cannot conclude that Taylor could not knowingly and intelligently waive his right to counsel.

At the same time, we hasten to add that "the right to self-representation is not absolute." *Martinez v. Court of Appeal*,

18

528 U.S. 152, 161 (2000).  It permits defendants neither "to abuse the dignity of the courtroom" nor to disregard the "relevant rules of procedural and substantive law." *Faretta*, 422 U.S. at 834 n.46.  The District Court, attuned to these concerns, no doubt understood that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.*  Still, a trial court should exercise patience in difficult situations such as the one the District Court faced.  It should refrain from denying a defendant's initial request to represent himself on this ground where disruption is predicted but has not occurred. *See Indiana v. Edwards*, 554 U.S. 164, 185-86 (2008) (Scalia, J., dissenting) (reasoning that these "ground[s] for terminating self-representation [are] unavailable" when the defendants have not been permitted to proceed *pro se* and the defendants appear generally compliant); *United States v. Smith*, 830 F.3d 803, 810 (8th Cir. 2016) (adopting this position).  Nonetheless, a defendant's conduct may prove obstreperous enough to justify denying his request at the outset in some cases.  *See United States v. Hausa*, 922 F.3d 129, 135-36 (2d Cir. 2019) (per curiam) ("[The defendant's] obstruction is independent support for the denial of his purported waiver of counsel.  [His] misconduct was egregious and intolerable by any measure:  he hummed and screamed, and rambled incoherently; he cursed at the judge, declared him an enemy and threatened to kill him."); *see also Finch v. Payne*, 983 F.3d 973, 982 (8th Cir. 2020) ("The type of conduct required for a court to deny a defendant's request to proceed pro se generally requires extreme disruption of the judicial process.").

Here, however, the record does not establish that Taylor disrupted the proceedings.  *See United States v. Engel*, 968 F.3d 1046, 1050 (9th Cir. 2020) (noting that a district court

may not terminate a defendant's self-representation when, among other things, the defendant "file[s] numerous nonsensical pleadings" and "[is] uncooperative at times" (alterations in original) (internal quotation marks and citation omitted)); *Smith*, 830 F.3d at 810 ("Repeated, frivolous challenges to the court's jurisdiction, to the government's authority to prosecute, or to the validity of the federal laws [the] defendant is charged with violating, are not disruptive or defiant in this sense—unless they threaten to forestall pretrial or trial proceedings."). Rather, it shows that Taylor made a few attempts to advance arguments that made no sense. Even though, in doing so, he tried the District Court's patience and probably would have continued to do so if permitted to represent himself, the record does not reveal an "abuse [of] the dignity of the courtroom."

At bottom, while we respect the latitude that must be accorded to trial courts in evaluating litigants' behavior, the District Court, no doubt out of understandable frustration, acted prematurely and thereby denied Taylor his Sixth Amendment right. Rather than prohibit Taylor from representing himself at this early stage, it should have conducted the requisite inquiry and, if satisfied that he understood the consequences, allowed him to proceed *pro se*. That, however, would not have been the end of the matter. If the Court suspected that Taylor would eventually prove disruptive, it could have appointed standby counsel, knowing that he would step in if Taylor, in fact, sought to upend the proceedings. *See Faretta*, 422 U.S. at 834 n.46 (acknowledging that a court may appoint standby counsel "to be available to represent the accused in the event that the termination of the defendant's self-representation is necessary"); *Norman*, 633 F.3d at 669 (explaining that

20

appointing standby counsel would have offered the trial court an appropriate means to assuage any concerns it had about the defendant's ability to represent himself).

Under our case law, we may not hold the District Court's constitutional error harmless. *Peppers*, 302 F.3d at 127, 137. Yet, we recognize that, by seeking to represent himself and to propound "sovereign citizen" claims, Taylor placed the Court in an unenviable position and somewhat of a catch-22. Indeed, whenever a defendant invokes his right to self-representation, a district court risks violating the defendant's constitutional rights whether or not it permits the defendant to proceed *pro se*. *Pryor*, 842 F.3d at 451 (noting that the defendant's request to represent himself may lead to "the potential for an unconstitutional denial of the right to counsel if the right to self-representation is too quickly provided or reversal for unconstitutional denial of the right to self-representation if the right to counsel is too vigorously shielded"). Today, with respect for the District Court and the challenges it faced here, we simply hold that it misstepped while "travers[ing] . . . [this] thin line." *Fields v. Murray*, 49 F.3d 1024, 1029 (4th Cir. 1995) (en banc) (second alteration in original) (internal quotation marks and citation omitted).

IV.

Because the District Court denied Taylor's request to represent himself without completing a sufficient inquiry of the relevant matters, and thereby denied Taylor his Sixth Amendment right to self-representation, we will vacate Taylor's conviction and remand to the District Court for a new trial.